RILEY *v.* MASON MOTOR CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—FINDINGS OF INDUSTRIAL ACCIDENT BOARD—EVIDENCE—SUFFICIENCY.
    If there is any evidence to support findings of the industrial accident board, the Supreme Court will not undertake to weigh the evidence, or disturb the findings, even though it might have reached a different conclusion on the facts.

2. SAME.
    In proceedings for compensation under the workmen's compensation act, evidence *held*, to tend to support a finding that a foreign substance, which got into claimant's eye, caused its loss.

3. SAME — WILFUL MISCONDUCT OF EMPLOYEE — EVIDENCE — SUFFICIENCY.
    Evidence *held*, sufficient to sustain a finding of the industrial accident board that claimant was not guilty of wilful

and unreasonable conduct in refusing to have his eye treated in accordance with the wishes of his physicians.

4. SAME—WORKMEN'S COMPENSATION ACT—BASIS OF AWARD.

Under the workmen's compensation act (Act No. 10, Extra Session 1912), part 2, § 11 (2 Comp. Laws 1915, § 5441), providing that if an injured employee has not worked in his employment during substantially the whole of the preceding year, his average annual earnings shall consist of 300 times the average daily wage of an employee of the same class working substantially the whole of the immediately preceding year in the same or a similar employment shall have earned in such employment during the days when so employed, the annual earnings of an employee are to be computed by taking 300 times the average wage or salary which the employee has earned in his employment during the days employed.[1]

Certiorari to Industrial Accident Board. Submitted October 18, 1917. (Docket No. 123.) Decided December 27, 1917.

William Riley presented his claim for compensation against the Mason Motor Company for injuries received in defendant's employ. From an order awarding compensation, defendant and the Zurich General Accident & Liability Insurance Company, insurer, bring certiorari. Affirmed.

*Kerr & Lacey,* for appellants.

*James S. Parker (C. W. Wilber,* of counsel), for appellee.

KUHN, C. J. Certiorari to the industrial accident board. The claims of the applicant which find support in the testimony taken before the committee on arbitration are thus stated by the board in their findings:

[1]On construction and effect of workmen's compensation acts, generally, see comprehensive note in L. R. A. 1916A, 23, L. R. A. 1917D, 80.

"It is not denied but that the applicant, on or about the 20th day of September, 1916, got a foreign substance into his eye while working in the plant of the respondent employer, and he testified that this substance was from an emery wheel, and that he got it into his right eye. He claims that he went to Dr. Childs, the physician of the respondent employer, but that the doctor could not find the foreign substance. He testified that the doctor put medicine into his eye which caused him great pain, and put bandages over his eye, and told him to leave the bandages there until the next day. The next day the applicant went to Dr. Orr, who, either on that day or some other day, advised the applicant to go to a hospital, but he claims that he had no means with which to go to a hospital, and that in any event there was no room at the hospital to which the doctor telephoned. The applicant was about 77 years of age, and testified that he had good eyesight prior to the accident. It seems that Dr. Orr refused to treat him unless he would go to a hospital. The applicant claims that Dr. Orr removed the foreign substance from the eye instead of Dr. Childs. Dr. Childs' testimony is to the effect that he removed it. The applicant testified that Dr. Orr put medicine in his eye which caused him great pain.

"The applicant also went to Dr. Bird, who advised him to have the eye taken out, and then he went to Dr. Conover. Four physicians had more or less to do with this man's eye at the time it was hurt, but, notwithstanding that fact, he lost the eye.

"The respondents claim that the applicant put a potato poultice on his eye while it was sore, and that he should not have done so, and that said potato poultice may have cost the man his eye. There is some conflict in the testimony as to whether or not a potato poultice was used. He and his daughter claim none was used. One or two other witnesses claim that he once told them that he used a potato poultice."

The committee on arbitration refused the applicant compensation, which findings and award were reversed by the industrial accident board.

The first claim made by the respondent is that the injury which it is conceded the applicant sustained in

no way contributed to the loss of the eye. The industrial accident board determined against this contention of the appellant, and that the loss of the eye was attributable to the accident complained of, and the question for us to determine is whether there is any evidence to support this finding, as we will not undertake to weigh the evidence or disturb the findings, even though we might have reached a different conclusion on the facts.

It is the claim of the applicant that the original injury caused the development of a corneal ulcer, and, as a result thereof, the applicant lost his eye. As to whether or not the corneal ulcer would result as it did in the case of applicant is a question upon which the medical witnesses sworn differ. The board based its conclusion upon the testimony of Dr. T. S. Conover, and their finding with reference thereto is thus stated by them:

"Dr. T. S. Conover was sworn and testified that at a date which he could not give the applicant came into his office suffering with a corneal ulcer of the right eye; that the man was then blind, and permanently blind; that the cause was an infection; and that it might result from getting emery dust into the eye and from the inflammation attendant upon it. This doctor testified that a corneal ulcer depends upon the abrasion of the corneal surface, and that it was usually secondary to an injury, and that the infection must gain entrance to the cornea through an abrasion and through lowered resistance, and that you would not get an ulcer without an abrasion to the cornea. He was asked:

" 'Q. Do you not sometimes get an ulcer without an abrasion to the cornea?

" 'A. Well, no; I would not say that was possible. I believe in this case there was an abrasion, may not be seen, but it is there, that is, it may not be plain to the naked eye, but there is disturbance of the epithelium before your infection can gain entrance to do its damage.

" 'Q. Now, did you find, however, any corneal abrasion, it having been determined upon carefully by examination by an expert that there was no corneal abrasion, for weeks prior to the time that he came to you; what would you say?

" 'A. Well, I would think the expert just simply— his expertness was not sufficient to locate the site of his abrasion by his investigation.

" 'Q. Then, Doctor, there is no question whatsoever but what there was a corneal abrasion in this case?

" 'A. Yes; in all corneal ulcers you must have an abrasion of the corneal substance before infection can gain entrance to do damage to the substance of the eye.'

"We do not think it necessary to quote more of the testimony of this physician, but we rely considerably upon his testimony. It seems to the board that this foreign substance caused an abrasion to the cornea, and that the ulcer resulted, and that the man lost his eye because of the abrasion and the ulcer."

Being satisfied that the question presented was one of fact, and that applicant's claim in regard thereto finds support in the evidence, we are unable to disturb the findings of the board with reference thereto.

The second contention of the respondents is that the loss of the applicant's eye was not due or traceable to accidental injury, but to flagrant personal neglect in refusing to have it treated in accordance with the directions of the physicians. If the board believed the testimony of the applicant and his witnesses, we are of the opinion that it cannot be said that his conduct was so wilful and unreasonable that he should, because thereof, be denied compensation. We must take the applicant as we find him. He was a man apparently of very limited education, and no more knowledge should be expected of an employee than he actually possesses. His claims with reference thereto have been set forth in the findings above quoted, and we do not think that this case is one that should come within the ruling of the court in *Kricinovich* v. *Foun-*

*dry Co.*, 192 Mich. 687 (159 N. W. 362). It is rather more like the case of *Poniatowski* v. *Stickley Bros. Co.*, 194 Mich. 294 (160 N. W. 569). It is not a case where the applicant refused all treatment, nor has he been guilty of a failure to exercise "the primary duty owing to himself and society to make use of every available and reasonable means to make himself whole," which is the language used in the opinion of *Kricinovich* v. *Foundry Co., supra,* in which case it was conceded that the applicant refused to submit to a minor operation, which in the judgment of all the physicians was not dangerous in itself and would in all probability bring relief. We believe that there is sufficient testimony to support the conclusion of the board that in this case the applicant's conduct was not unreasonable or wilful.

The respondents make a further contention that the method adopted by the industrial accident board in computing the applicant's average weekly wage was contrary to the provisions of the law; it being claimed that, under the undisputed evidence, the applicant entered the employ of the Mason Motor Company May 23, 1916, and continued there until October 6, 1916, during which period he worked a portion of 78 days, and that he did not work regularly, and that there were during this period 32 working days when he did not report at all to his employer for service. The record discloses, however, that in September there was a slacking up in the factory, and it also appears that applicant's irregular work after September 19, 1916, was probably due to the fact that he was suffering from his injury.

Section 11 of part 2 of Act No. 10, Extra Session 1912 (workmen's compensation law, 2 Comp. Laws 1915, § 5441), provides in part:

"* * * If the injured employee has not worked in such employment during substantially the whole

of such immediately preceding year, his average annual earnings shall consist of three hundred times the average daily wage or salary which an employee of the same class working substantially the whole of such immediately preceding year in the same or a similar employment in the same or a neighboring place, shall have earned in such employment during the days when so employed." *   *   *

We are of the opinion that the legislature had in mind that in every employment the employees work more or less irregularly, and that the annual earnings of any employee shall be determined by taking 300 times the average daily wage or salary which the employee has earned in such employment during the days so employed. This was undoubtedly the best method that could be provided for compensating a person; for if the employee does not work often enough to satisfy his employer, the employer has the option to discharge him. We see no error in the method adopted by the board in measuring the compensation.

Being of the opinion that there is no error in the proceedings of the board, the award is affirmed in all respects, with costs in favor of the applicant.

STONE, OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.